STATE OF NEBRASKA, APPELLEE, V. MICHAEL W. RYAN,
APPELLANT.

534 N.W.2d 766

Filed July 21, 1995.   No. S-94-207.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HASTINGS, C.J., WHITE, CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

PER CURIAM.

Michael W. Ryan, who was convicted of first degree murder and sentenced to death for the torture slaying of James Thimm, appeals an order of the trial court denying him postconviction relief.

We affirm the order of the district court denying postconviction relief to Ryan.

## I. STANDARD OF REVIEW

A criminal defendant seeking postconviction relief has the burden of establishing a basis for such relief, and the findings of the district court will not be disturbed unless clearly erroneous. *State v. Williams*, 247 Neb. 931, 531 N.W.2d 222 (1995); *State v. Barrientos*, 245 Neb. 226, 512 N.W.2d 144 (1994).

In an evidentiary hearing at a bench trial provided by Neb. Rev. Stat. § 29-3001 et seq. (Reissue 1989 & Cum. Supp. 1994) for postconviction relief, the postconviction trial judge, as the trier of fact, resolves conflicts in evidence and questions of fact, including witness credibility and weight to be given a witness' testimony. *State v. Nielsen*, 243 Neb. 202, 498 N.W.2d 527 (1993); *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992).

When a defendant in a postconviction motion alleges a violation of his constitutional right to effective assistance of counsel as a basis for relief, the standard for determining the

propriety of the claim is whether the attorney, in representing the accused, performed at least as well as a lawyer with ordinary training and skill in the criminal law in the area. Further, the defendant must make a showing of how the defendant was prejudiced in the defense of his case as a result of his attorney's actions or inactions. *State v. Williams, supra*; *State v. Nielsen, supra.*

To sustain a claim of ineffective assistance of counsel as a violation of the Sixth Amendment to the U.S. Constitution and thereby obtain reversal of a defendant's conviction, the defendant must show . that (1) counsel's performance. was deficient and (2) such deficient performance prejudiced the defense, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Clausen*, 247 Neb. 309, 527 N.W.2d 609 (1995).

## II. FACTS

The sordid facts of this case are fully set forth in this court's opinion rendered as a result of Ryan's direct appeal. See *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989), *cert. denied* 498 U.S. 881, 111 S. Ct. 216, 112 L. Ed. 2d 176 (1990) (*Ryan I*). We have included only those facts necessary to an understanding of the issues in this appeal.

The facts, as reflected by the record, are as follows:

During the summer and fall of 1984, Ryan and several other men and women, along with 10 of their children, moved to a farm owned by Ora Richard (Rick) Stice located near Rulo, Nebraska. The group was united by their common interest in the teachings of a certain Rev. James Wickstrom. Group members studied the Bible and referred to God as "Yahweh."

The group also believed that Ryan and other members of the group possessed the spirits of archangels and that the infant of a female group member who became pregnant while at the farm was divinely conceived. Members of the group considered Ryan to be the leader and obeyed his orders without question. Ryan sometimes referred to himself as "king." Ryan claimed to hear "Yahweh" speak directly to him and allegedly saw visions in the sky. He further claimed to know what other group members

were thinking and to be able to predict things which later came true.

Although Ryan was legally married to Ruth Ryan, he also "married" four female group members, three of whom were themselves married to other men, claiming that this was done at the direction of "Yahweh."

Every detail of every activity at the farm was determined by consulting "Yahweh" through a method called the "arm test." To perform the arm test, one group member would hold his or her right arm out, and a second group member would place one hand on the shoulder and one hand on the wrist of the first group member, exerting downward pressure on the arm. The second group member would then question "Yahweh." If "Yahweh's" answer was yes, the arm stayed up; if the answer was no, the arm would yield to the pressure and fall. Group members were permitted to use the arm test only with Ryan's permission.

The group also had strong survivalist and paramilitary characteristics. Large amounts of food, ammunition, and weapons, including fully automatic weapons, were stockpiled on the farm. Each of the men in the group was assigned a military rank and was able to work up to the rank of general. Those men included Ryan's son, Dennis Ryan, who was 15 years old at the time these incidents occurred, but who was treated as a man. The other men on the farm, in addition to Michael and Dennis Ryan, included Rick Stice, James Thimm, Timothy Haverkamp, David Andreas, and James Haverkamp.

Early in 1985, Thimm, Stice, and Stice's 5-year-old son, Luke, fell out of favor with "Yahweh" for various reasons and were demoted by Michael Ryan to slave status. After their demotion, the three were moved to a separate house on the farm where they were subjected to physical, psychological, and sexual abuse.

In March, while Ryan was temporarily absent, Rick Stice escaped from the farm and returned 7 or 8 days later. After that time, the treatment of Stice and Thimm worsened. At night, the two men were sometimes chained and were forced to sleep on a porch. If Stice and Thimm went outside during the daytime,

they were guarded by the other men to prevent them from running away.

Late in March, after Rick Stice had returned, Ryan shoved 5-year-old Luke Stice, causing him to strike his head and lose consciousness. No medical help was sought for the child, and he died later that evening. Luke Stice was buried on the farm property. Early in April, Rick Stice again escaped from the farm, and he did not return.

Ryan's abuse of Thimm culminated in one final, torturous episode near the end of April. On April 28, Ryan accused Thimm of blaspheming "Yahweh" and of trying to poison the group by putting household cleaner on a wild turkey that was being stored in the refrigerator. Ryan launched into a brutal "discipline" of Thimm dictated by "Yahweh" through the arm test. Michael and Dennis Ryan, Andreas, and Timothy and James Haverkamp all participated in these events.

Thimm was taken to a hog confinement building, where, over a period of 2 days, the men took turns sexually assaulting Thimm by penetrating his anus with a shovel handle until his bowel ruptured, whipping Thimm on his back and abdomen, and shooting off the fingertips of Thimm's left hand. (The trial court stated that Thimm was "sodomized" in reference to the men penetrating Thimm's anus with the shovel handle. See Neb. Rev. Stat. § 28-318(6) (Reissue 1989), defining sexual penetration as including "any intrusion . . . of . . . any object manipulated by the actor into the . . . anal open[ing] of the victim's body." See, also, *People v Merriweather*, 447 Mich. 799, 527 N.W.2d 460 (1994), in which the Michigan Supreme Court referred to the insertion of an object into a victim's anus as sodomy.) Thimm was forced to disrobe for this abuse and was chained or tied with baling wire during much of this time. Michael Ryan also broke Thimm's arm, permitted Dennis Ryan to break Thimm's left leg, and directed Timothy Haverkamp in breaking Thimm's right leg. Michael Ryan then demonstrated to Timothy Haverkamp and Dennis Ryan how to skin a human being by using a razor blade and a pair of pliers to skin part of Thimm's leg.

Ultimately, Michael Ryan stomped on Thimm's chest, breaking several of his ribs, and Thimm died on April 29, 1985.

Thimm's body was placed inside a sleeping bag and buried in an unmarked grave on the farm.

On June 25, 1985, Andreas and James Haverkamp were arrested for stealing a sprayer rig. While in jail, those two men decided to notify the authorities of events which had taken place on the Rulo farm. On August 17 and 18, the farm was searched by a team of law enforcement officers, and the bodies of 5-year-old Luke Stice and Thimm were exhumed.

Michael Ryan was subsequently charged with two counts of first degree murder for the killings of Luke Stice and Thimm. Dennis Ryan was charged with first degree murder for the killing of Thimm. Timothy Haverkamp pled guilty to second degree murder before Michael Ryan's trial and testified for the State in that trial. Andreas and James Haverkamp pled guilty to lesser charges before Ryan's trial and also testified for the State.

Ryan was convicted of Thimm's first degree murder at a jury trial and was subsequently sentenced to death. His conviction and sentence were affirmed by this court. See *Ryan I.* After Ryan was found guilty, but before he was sentenced, he pled no contest to a reduced charge of second degree murder for the killing of Luke Stice and was sentenced to life imprisonment on that charge.

We note that Ryan was represented at trial by Richard Goos, an experienced criminal defense attorney from the Lancaster County Public Defender's office, and Louis Ligouri, an attorney in private practice, both of whom were appointed by the trial court. Goos was first employed by the Lancaster County Public Defender's office in 1971. He testified at Ryan's postconviction hearing that he had represented approximately nine first degree murder defendants, including two on whom the State sought to impose the death penalty, before he was appointed to represent Ryan.

Two of the nine first degree murder defendants were convicted as charged and sentenced to death. Of the remaining seven first degree murder defendants, Goos testified, three were convicted of second degree murder, three were convicted of manslaughter, and one was acquitted. Goos also testified that prior to the time he represented Ryan, he had handled three or four cases in which an insanity defense was asserted.

After trial and before sentencing, the court terminated Ligouri's services and soon thereafter appointed Bruce Dalluge to assist Goos in preparation for Ryan's sentencing hearing. Dalluge represented Ryan on his direct appeal.

On December 17, 1991, Ryan filed a second amended motion for postconviction relief, requesting that his conviction and sentence be set aside as being obtained in violation of his federal and state constitutional rights. Throughout the postconviction proceedings, Ryan was represented by court–appointed counsel, Robert Creager. In the postconviction proceedings, Ryan alleged, in 16 claims containing numerous subparts, that his conviction and sentence were infirm for the following reasons: (1) constitutional errors appearing on the trial record, (2) constitutional errors on the record on direct appeal, (3) ineffective assistance of trial counsel, and (4) prosecutorial misconduct. Ryan also filed a pretrial statement of issues, listing 36 "issues," in the district court. At some point, the issue of cumulative error was also raised as issue 37.

The district court granted an evidentiary hearing on 25 of the 36 issues listed; retained 7 issues for the purpose of argument, limiting evidence to the record made at trial and sentencing; and struck 4 of the issues. An evidentiary hearing was held, following which the district court entered an order denying Ryan postconviction relief.

Ryan timely appealed to this court, making 14 assignments of error on appeal. He also raises in this court the 37 issues which were before the district court.

## III. ASSIGNMENTS OF ERROR

Ryan contends that the postconviction trial court erred in (1) prohibiting the use of expert testimony to establish claims of ineffective assistance of counsel; (2) striking several of Ryan's claims; (3) failing to find that Ryan had been denied effective assistance of counsel at his trial with respect to advisement of all available defenses, the assertion of the insanity defense, the assertion of the insanity defense over Ryan's objection, the failure to object to a joint trial with Dennis Ryan, and Michael Ryan's decision to testify at trial; (4) failing to find that Ryan had been denied effective assistance of counsel at sentencing

because counsel failed to respond to false testimony and permitted Ryan to testify at trial; (5) failing to find that Ryan had been denied effective assistance of counsel in connection with the preparation and presentation of issues at sentencing, including development of all statutory and nonstatutory mitigating circumstances, meeting statutory aggravating circumstances, making all available constitutional challenges to the death penalty, and formulating a reasonable trial strategy with respect to sentencing issues; (6) failing to find that aggravating circumstance (1)(d) of Neb. Rev. Stat. § 29-2523 (Reissue 1989) was unconstitutional on its face and as applied to Ryan; (7) failing to find that aggravating circumstance (1)(a) of § 29-2523 was unconstitutional on its face and as applied to Ryan; (8) failing to find that Ryan's constitutional rights were violated at sentencing by the lack of standards for the impaneling of a three-judge panel, the trial judge's refusal to recuse himself, and the trial judge's refusal to convene a three-judge panel; (9) failing to find that the evidence was insufficient to support the application of statutory aggravating circumstances (1)(d) and (1)(a); (10) failing to find that Ryan was denied his right to a statutory proportionality review on appeal; (11) failing to find that deposition misconduct by the prosecution deprived Ryan of his rights to due process of law; (12) failing to find that Ryan had been deprived of his right to counsel by the firing of one of his trial attorneys; (13) failing to find that the cumulative effect of all the errors in this case deprived Ryan of a fair trial; and (14) failing to grant Ryan postconviction relief.

The 37 issues raised by Ryan in his brief, many of which he concedes are not supported by the record or have been adequately dealt with on direct appeal and are only being raised for the purpose of federal appellate review, are as follows: (1) unconstitutionality of aggravating circumstance (1)(d) as applied to Ryan, (2) unconstitutionality of aggravating circumstance (1)(a) as applied to Ryan, (3) unconstitutional reliance of aggravating circumstance (1)(a) on "vicarious" findings, (4) proportionality review, (5) lack of standards for impaneling a three-judge panel, (6) unconstitutionality of death by electrocution, (7) trial judge's refusal to recuse himself from

sentencing, (8) insufficient evidence to support aggravating circumstance (1)(d), (9) insufficient evidence to support aggravating circumstance (1)(a), (10) failure to advise on all possible defenses, (11) failure to advise on insanity defense, (12) unreasonable assertion of the insanity defense, (13) failure to object to joint trial, (14) failure to advise on testifying at trial and sentencing, (15) deposition misconduct, (16) failure to call witnesses, (17) failure to cross-examine one of the female cult members, (18) failure to reply to false trial testimony of defense psychiatric expert regarding an army induction incident, (19) discharge of Ligouri, (20) failure to conduct a voir dire examination of judge regarding a three-judge sentencing panel, (21) failure to consult with Ryan in preparation for sentencing, (22) failure to develop all statutory and nonstatutory mitigating circumstances, (23) failure to meet the burden of proof on mitigating circumstances, (24) entry of a no contest plea in the Luke Stice case, (25) failure to object to sentencing evidence, (26) prosecutorial misconduct, (27) reasonable doubt instruction, (28) failure to object to the reasonable doubt instruction, (29) state of the appellate record, (30) judicial misconduct during trial, (31) judicial misconduct at sentencing, (32) judicial interference with right to counsel, (33) failure to object to a jury instruction, (34) violation of sequestration order by experts, (35) jury misconduct (juror falling asleep), (36) jury misconduct (juror reading newspaper), and (37) cumulative effect of errors.

## IV. ANALYSIS

Before proceeding further, we observe that analysis of this case is made needlessly confusing for both the court and opposing counsel by Ryan's nonconformist approach to the organization of the errors of the district court on appeal to this court. Supreme Court rules provide that the brief of an appellant shall contain, among other things,

> [a] separate, concise *statement of each error* a party contends was made by the trial court, together with the issues pertaining to the assignments of error. Each *assignment of error* shall be separately numbered and paragraphed, bearing in mind that *consideration of the*

*case will be limited to errors assigned and discussed.*
(Emphasis supplied.) Neb. Ct. R. of Prac. 9D(1)d (rev. 1992).

Nonetheless, Ryan has presented the court with a voluminous brief which lists not only 14 assignments of error but also an additional 37 issues on appeal. We note that Ryan has brought all 37 issues which were before the district court before this court for further consideration. Some of these issues are subsumed in Ryan's 14 assignments of error, some appear to stand alone, and yet others have been abandoned for various reasons.

Because of the seriousness of the offense of which Ryan has been convicted, we have given Ryan the benefit of the doubt in order to fully address all issues except those which have been clearly abandoned. In addition, we exercise our option to review the record for plain error. See Neb. Rev. Stat. § 25–1919 (Cum. Supp. 1994). However, Ryan and his counsel should not mistake the court's tolerance as approval of their creative approach to brief writing in clear violation of the court's rules.

We now address the assignments of error raised by Ryan.

## 1. EXPERT TESTIMONY

In his first assignment of error, Ryan claims that the postconviction court erred in prohibiting the use of expert testimony to establish his claim of ineffective assistance of trial counsel. He concedes that this court has held that expert evidence is generally not admissible as proof that the assistance of counsel in a criminal case was ineffective. See, e.g, *State v. Thomas*, 236 Neb. 553, 462 N.W.2d 862 (1990); *State v. Joubert*, 235 Neb. 230, 455 N.W.2d 117 (1990), *cert. denied* 499 U.S. 931, 111 S. Ct. 1338, 113 L. Ed. 2d 269 (1991); *State v. Gagliano*, 231 Neb. 911, 438 N.W.2d 783 (1989); *State v. Ohler*, 219 Neb. 840, 366 N.W.2d 771 (1985).

However, we need not reach this issue, because the record fails to show that Ryan attempted at any time to offer expert testimony to establish his claim of ineffective assistance of trial counsel. An issue not presented to or passed upon by the trial court is not an appropriate issue for consideration upon appeal. *State v. Tanner*, 233 Neb. 893, 448 N.W.2d 586 (1989); *State v. Brockman*, 231 Neb. 982, 439 N.W.2d 84 (1989); *State v.*

*Narcisse*, 231 Neb. 805, 438 N.W.2d 743 (1989). This assignment of error is without merit.

## 2. STRIKING CLAIMS

Ryan next assigns as error the postconviction court's striking of several of Ryan's claims prior to his hearing. The record reflects that the postconviction court struck issue 6, which claimed that death by electrocution is cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution and Neb. Const. art. I, § 9; issues 27 and 28, challenging the reasonable doubt jury instruction; and issue 29, relating to the state of the appellate record in Ryan's direct appeal.

Ryan has since conceded both in his reply brief and at oral argument that issues 27 and 28 cannot form the basis for relief because the U.S. Supreme Court has recently upheld Nebraska's reasonable doubt instruction. See *Victor v. Nebraska*, ___ U.S. ___, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994). Ryan likewise has conceded that issue 29, relating to the complex and confusing nature of the appellate record, lacks legal merit. However, Ryan continues to maintain that the postconviction court erred in striking issue 6 on the constitutionality of electrocution as punishment for crime.

We have held that "[t]he death penalty by electrocution as punishment for crime is not a cruel and unusual punishment within the meaning of the state and federal Constitutions." *State v. Alvarez*, 182 Neb. 358, 366, 154 N.W.2d 746, 751 (1967), *cert. denied* 393 U.S. 823, 89 S. Ct. 81, 21 L. Ed. 2d 94 (1968). More recently, the U.S. District Court for the District of Nebraska has held that death by electrocution does not amount to impermissible cruel and unusual punishment. *Harper v. Grammer*, 654 F. Supp. 515 (1987). There is no legal merit to issue 6.

There being no legal merit to any of the four claims stricken by the postconviction court, Ryan has suffered no prejudice by the court's actions. This assignment of error affords no basis for postconviction relief.

## 3. INEFFECTIVENESS OF COUNSEL

In assignment of error 3, Ryan asserts that the postconviction

court erred in failing to find that Ryan had ineffective assistance of counsel. Specifically, counsel's alleged ineffectiveness, raised in issues 10 to 14, includes the assertions that counsel (1) failed to advise Ryan on all possible defenses, (2) failed to advise him on the insanity defense, (3) unreasonably asserted the insanity defense, (4) failed to object to a joint trial with Ryan's son, Dennis, and (5) failed to advise Ryan on testifying at trial and at the sentencing hearing. We address each of these five issues seriatim.

(a) Failure to Advise on All Possible Defenses

In issue 10, Ryan asserts that his defense counsel failed to adequately advise him of all possible defenses to the crimes with which he was charged and failed to provide him with a professional assessment of the consequences of the various defense options.

At the postconviction hearing, Ryan testified that in meetings with his trial attorneys, Goos and Ligouri, the only options ever discussed with him were the possibility of a plea bargain and an insanity defense. Ryan argues that the defense of factual innocence, or guilt of the lesser-included offenses of second degree murder or manslaughter were available to him, as well as the option of putting on no defense.

Goos testified at the postconviction hearing that he and Ligouri considered resting at the end of the State's case, but that he rejected that possibility because he considered insanity to be not only a valid defense, but the only viable defense available to Ryan. In his opinion, other defenses were not available to Ryan. For example, Goos stated, there was no evidence to support self-defense as a potential defense. The record reflects that Goos did, however, argue to the jury in his closing statement that the element of malice was lacking in Ryan's actions and that Ryan should not be found guilty of first degree murder.

Ligouri testified at the postconviction hearing that he and Goos had specifically discussed with Ryan, on more than one occasion, the possibility of a second degree murder or manslaughter conviction, but that the predominant defense discussed was the insanity defense. Ligouri further testified that

the possibility of resting after the State's case was discussed between himself and Goos, as well as with Ryan. Ligouri believed that he and Goos had given Ryan a thorough explanation of the possible defenses that could have been asserted in his case.

Our review of the evidence shows that a defense of factual innocence would not have been successful in this case. Even without Ryan's own testimony about the acts leading to Thimm's death, there were four eyewitnesses to most of these acts, and at least two eyewitnesses to the rest. These eyewitnesses each testified to Ryan's sodomizing, whipping, and shooting of Thimm. The pathologists for both Ryan and the State testified that either of these first two acts could have been fatal to Thimm. There was also testimony from Ryan and other witnesses that "Yahweh" desired that Thimm die before 6 p.m. on the day of his death.

The conflict in testimony as to whether Goos and Ligouri discussed possible defenses with Ryan was resolved adversely to Ryan by the postconviction trial judge, who, as trier of fact, resolves such conflicts in the evidence. That judge's finding is not clearly erroneous. Moreover, implicit in the jury's verdict finding Ryan guilty of first degree murder is its rejection of factual innocence, as well as the lesser-included offenses of second degree murder and manslaughter, upon which the jury was instructed. Therefore, even assuming that his trial counsel failed to adequately discuss possible defenses with him, Ryan suffered no prejudice thereby. In passing, we note that the postconviction judge was a judge other than the one who presided over Ryan's jury trial and sentencing.

### (b) Failure to Advise on Insanity Defense

Ryan also claims, in issue 11, that trial counsel failed to advise him on the implications of the insanity defense. According to Ryan, the only thing he was told about the insanity defense was that it was the only way to "keep [him] out of the electric chair."

Both Goos and Ligouri testified at the postconviction hearing that they discussed the insanity defense repeatedly and at length with Ryan. Ligouri testified that Ryan was fully apprised of the

consequences of asserting an insanity defense, including that Ryan would be required to submit to examination by a State psychiatrist, that information would be available to the State through the psychiatrist that would be otherwise unavailable to the State, that to some extent Ryan would be waiving his privilege against self–incrimination, and that evidence of some uncharged misconduct would become admissible at trial.

Again, the postconviction trial judge, as the fact finder, resolved this conflict in evidence against Ryan, and it was not clearly erroneous for him to do so.

### (c) Assertion of Insanity Defense

Ryan contends in issue 12 that his trial counsel unreasonably asserted an insanity defense over his objection, in violation of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution.

Although Ryan testified at his postconviction hearing that he was adamantly opposed to the insanity defense and objected repeatedly to its assertion, he admitted that he cooperated with a psychiatrist who examined him on his own behalf, as well as one who examined him for the State. Ryan further conceded that at a "pretrial thing" at Falls City, he told his attorneys to "do whatever you think you've got to do, but . . . I'm not going to go any further with your insanity crap."

During direct examination of Ryan at trial, the following exchange took place between Ryan and Goos:

Q: Do you think that you are crazy?

A: Me?

Q: Yes.

A: No, I don't.

Q: Do you think you were crazy back when James Thimm was killed?

A: No. I was doing what I felt we was told to do whether it was what I wanted or not.

Q: You know that Mr. Ligouri and I filed a notice of insanity defense in this case?

A: Yeah, and you know I argued with you about it.

Q: Well, were we successful finally in getting you to agree that we put the question to the jury even though you

objected to our doing so?

A: I finally told you, *"If that's what you wanted to do, do it,"* but it was at my objection, and that's what you done.

(Emphasis supplied.)

Goos testified that he had no memory of Ryan repeatedly stating to trial counsel that he did not wish to raise the insanity defense. Rather, Goos testified that Ryan was "very cooperative" with the insanity defense and made no objection to it even after the trial was over.

Ligouri testified that while Ryan was not in favor of the insanity defense, he did consent to its use in his behalf. Ligouri stated that he found Ryan to be a cooperative client who entrusted the decision on the use of the insanity defense to his defense attorneys.

Both attorneys testified that Ryan cooperated with the psychiatrists utilized in connection with the case. The postconviction trial judge, in refusing Ryan relief on this issue, stated that Ryan "objected to being called crazy, but authorized his counsel to use the [insanity] defense."

A case directly on point with the present case is *Gacy v. Welborn*, 994 F.2d 305 (7th Cir. 1993). In that case, the defendant was convicted of the serial killing of 33 young men whom he lured to his home for homosexual liaisons. Gacy restrained his victims, strangled them to death, and then disposed of most of the bodies in the crawl space of his home.

Gacy relied on an insanity defense, but was convicted of 33 counts of murder and was sentenced to death for 12 of the killings. During the course of the trial, Gacy announced to the court that he was " 'against the insanity defense from the beginning.' " 994 F.2d at 317.

In his petition for a writ of habeas corpus, Gacy claimed that his defense counsel had raised the insanity defense over his objections, thus depriving him of the ability to control decisions vital to his defense. The U.S. Court of Appeals for the Seventh Circuit rejected this argument, stating:

As for the contention that counsel barged ahead with an unwanted insanity defense . . . the evidence gets in the way. Gacy cooperated with extended interviews and tests

by six experts for the defense and another six for the state, not the behavior you would expect of a person who wanted to stand on a plain denial of guilt.

994 F.2d at 317.

We note that two psychiatrists and a clinical psychologist testified on Ryan's behalf at trial. Dr. William S. Logan, a psychiatrist, had conducted two interviews with Ryan, the first lasting approximately 8 hours and the second lasting approximately 1½ hours. Dr. Logan testified that there were only one or two times when Ryan refused to answer his questions. He stated that he personally did not do any psychological testing of Ryan.

The other psychiatrist who testified on Ryan's behalf, Dr. Maurice K. Temerlin, had interviewed Ryan for approximately 3½ hours. Although Dr. Temerlin testified that Ryan was initially tense and angry, Dr. Temerlin never indicated that Ryan had failed to cooperate with the interview. In fact, both Dr. Logan and Dr. Temerlin were able to obtain enough information from Ryan to evaluate him and to form a medical opinion as to his psychiatric condition.

Dr. Robert Schulman, a clinical psychologist who testified in Ryan's behalf, testified that he had conducted a 4-hour interview with Ryan in order to perform a battery of intellectual and personality tests. According to Dr. Schulman, he used at least eight separate evaluation techniques, including a Rorschach test, on Ryan. He was also able to arrive at a diagnostic conclusion on the basis of his testing.

Dr. Emmett M. Kenney, a psychiatrist, evaluated Ryan for the State. Dr. Kenney examined Ryan for 1 hour 20 minutes and also relied on the report of a Dr. Strider, a psychologist who had evaluated Ryan upon Dr. Kenney's recommendation. Dr. Kenney testified that Ryan refused to talk to him about some things, including the events surrounding Thimm's death. Dr. Kenney also testified that according to Dr. Strider's report, one psychological test of Ryan was aborted because Ryan refused to follow the instructions, and another, the Rorschach or inkblot test, was invalid because Ryan did not provide a sufficient number of responses for the test to be interpreted.

Ryan testified at his postconviction hearing that he did, in

fact, agree to talk to Dr. Logan, although he claimed that he was uncooperative in Dr. Logan's testing of him. According to Ryan, he "took part of them and got up and walked out. . . . They was looking at ink blots and things like this, and they had one that had . . . hundreds of questions, and I done part of them and that was the end of it. I just left."

Attorney Ligouri testified that in his opinion, Ryan was cooperative with both Dr. Logan and Dr. Kenney. He did not recall either Dr. Logan or Dr. Kenney asking Ryan to perform any tests. Attorney Goos also testified that Ryan cooperated with the many doctors who examined him.

Ryan's testimony that he did not fully cooperate with Dr. Logan is inconsistent with the trial testimony of Dr. Logan, as well as with the postconviction hearing testimony of his trial attorneys. The testimony of Ligouri and Goos, as well as the trial testimony of the psychiatrists and the psychologist who examined Ryan, leads to the inescapable conclusion that Ryan did cooperate with the experts who were assisting him in his insanity defense and that it was only the *State's* experts that Ryan refused to cooperate with to some degree. We agree with the *Gacy* court that this is not the behavior one would expect from a defendant who is completely opposed to the assertion of an insanity defense.

Moreover, Ryan's jury trial testimony reflects that although he did not think he was crazy and he objected to the insanity defense, he had agreed to let his trial attorneys proceed with the insanity defense if they wanted to. As the court noted in *Gacy v. Welborn*, 994 F.2d 305, 317 (7th Cir. 1993), "A statement such as 'I was against the insanity defense from the beginning' is some distance from 'I directed [trial counsel] to drop that defense, and he refused.' Being 'against' a defense at the outset is consistent with yielding to the judgment of those who know better." We find that Ryan acquiesced in the assertion of the insanity defense.

We hold that the insanity defense for Ryan was an objectively reasonable trial strategy. Goos and Ligouri were faced with the almost impossible task of defending a man who had repeatedly committed various acts of most horrible torture upon another human being; who did these acts in the name of an angry deity;

who heard his deity speak audibly to him; who believed that every aspect of his life, as well as the lives of others in the group, was directed by that deity through an arm test; who believed he possessed the spirit of an archangel; who believed he could predict the future and read the minds of others in the group; who saw visions in the sky; who believed that a female group member's infant had been divinely conceived; and who stated that he was directed by his deity to marry four women, even though he was already legally married to another woman.

It is an understatement to say that trial counsel was presented with an almost insurmountable set of facts. Goos testified that he could perceive no disadvantages to using the insanity defense that would outweigh its use, because "the man was obviously either insane or he was unbelievably cruel and subhuman." Additionally, it is apparent from the record that the defense of factual innocence would have been unsuccessful, as were counsel's arguments in favor of a lesser-included offense.

In determining whether a trial counsel's performance was deficient, there is a strong presumption that such counsel acted reasonably. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See, also, *State v. Lindsay*, 246 Neb. 101, 517 N.W.2d 102 (1994); *State v. Nielsen*, 243 Neb. 202, 498 N.W.2d 527 (1993). When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel. *State v. Johnson*, 243 Neb. 758, 502 N.W.2d 477 (1993); *State v. Nielsen, supra*; *State v. Lyman*, 241 Neb. 911, 492 N.W.2d 16 (1992).

Given the facts of this case, we decline to second-guess the decision of Ryan's trial counsel to assert an insanity defense. Based upon the evidence in this case, we agree with the postconviction trial judge that the assertion of the insanity defense on Ryan's behalf was a reasonable strategic choice by counsel. Therefore, Ryan is not entitled to postconviction relief on this issue.

### (d) Failure to Object to Joint Trial

Ryan contends in issue 13 that his trial counsel failed to adequately advise him of the consequences of a joint trial with

his son, who had also been charged with first degree murder in the death of Thimm. Ryan claims that the consolidation was prejudicial to his defense, because his son's trial counsel blamed everything on Ryan.

In Ryan's direct appeal, he claimed that he was prejudiced by the trial court's failure to sustain his motion to sever his case from his son's case. See *Ryan I*. At that time, we held that Ryan had failed to show that he was prejudiced by the joinder of his trial with the trial of his son. *Id*.

Although Ryan now frames this issue as one of ineffective assistance of counsel, we nevertheless continue to adhere to our holding in *Ryan I*. Because we have already determined that Ryan was not prejudiced by having a joint trial, he cannot have suffered any prejudice from trial counsel's allegedly deficient advice on this issue, and we need not address whether such performance was in fact deficient. See *Strickland v. Washington, supra*. Moreover, in this state, from a procedural standpoint, a motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased. *State v. Nielsen, supra*; *State v. Stewart*, 242 Neb. 712, 496 N.W.2d 524 (1993), *cert. denied* ____ U.S. ____, 114 S. Ct. 97, 126 L. Ed. 2d 64. Ryan is not entitled to postconviction relief on issue 13.

### (e) Failure to Advise on Testifying

In the last issue raised in assignment of error 3, which Ryan discusses as issue 14, Ryan complains that his trial counsel failed to advise him about testifying at trial and at sentencing. In a similar vein, Ryan alleges as part of assignment of error 4 that he was denied effective assistance of trial counsel because counsel permitted him to testify at trial. We elect to consolidate all issues related to Ryan's testifying at trial and sentencing for the purpose of discussion.

Ryan testified at his postconviction hearing that his trial counsel did not discuss with him the advisability of testifying in his own behalf at either his trial or his sentencing hearing, nor did they inform him of his Fifth Amendment right to remain silent and not take the witness stand. However, Ryan admitted

on cross-examination that he never told either of his trial attorneys that he did not wish to testify at trial.

Ligouri testified at the postconviction hearing that he had discussed the issue of testifying at trial with Ryan. He recalled informing Ryan "very early on" that he had the right not to testify. Ligouri described Ryan as a "pretty cooperative client" who was willing to go along with what his attorneys deemed to be in his best interests. Ligouri testified that Ryan expressed no reservations about testifying and that Ryan wanted to testify. Similarly, Goos testified at the postconviction hearing that he and Ligouri talked to Ryan at length about his proposed testimony and that Ryan never indicated that he did not wish to testify.

Ligouri stated that he and Goos discussed Ryan's testimony with him on more than one occasion and that he went over an outline of the questions that would be asked. Ligouri also testified that Ryan was informed that if he did testify, he would be subject to cross-examination, and Ligouri discussed with Ryan what questions might be covered on cross-examination.

Ligouri testified that the purpose of having Ryan testify at trial was to support the insanity defense and to support Ryan's claim that he had not struck the fatal blow to Thimm. Goos testified that Ryan also wished to take the witness stand in order to refute the testimony of certain witnesses he claimed were lying. Goos further testified that Ryan's testimony supported the defense's argument that Ryan had not acted maliciously, but, rather, had acted in response to the dictates of his god, "Yahweh."

Ryan now complains about only two topics on which his defense counsel elicited trial testimony. At his postconviction hearing, Ryan testified that he objected to trial counsel's questioning him about his belief that the telephone conversations of private parties could be selectively monitored by the government through satellite communications, and he especially objected to counsel's implication following such testimony that Ryan was "nuts, like that couldn't happen." Ryan also objected to questioning about his relationship with his mother while he was growing up. Ryan testified that he felt

counsel had not adequately prepared him to testify on these two topics.

However, Ryan was apparently very willing to testify to the events surrounding the killing of Thimm, as indicated by the following exchange between Ryan and his counsel during his postconviction hearing:

> Q. . . . . [T]hose are examples of things that you testified to that you weren't prepared for?
>
> A. Yeah. *I thought that they was going to ask me what happened out there at the farm with the incident and that's what we would be talking about,* and, like I say, he got off on this phone thing, and then wanting to talk about whether my mom and I got along or not, and I didn't have anything to say.

(Emphasis supplied.)

From this testimony and the rest of the record before us, we can only conclude that Ryan had no objection to testifying in his own behalf at the time of trial and that he has no present objection to having done so. Whether Ryan got along with his mother during his childhood is so collateral to the charge against him as to be insignificant, and his testimony that his telephone calls were being monitored by satellite clearly demonstrated his paranoia and was relevant to his insanity defense.

Ryan has not been prejudiced by the above complained–of testimony, nor was he prejudiced by any of his other testimony. As we have previously stated, the evidence against Ryan, testified to by eyewitnesses to the torture and killing of Thimm, was overwhelming. In his postconviction relief trial, Ryan failed to present any evidence from which either the postconviction court or this court could infer that had he exercised his Fifth Amendment right to remain silent either at trial or at his sentencing hearing, there was a reasonable probability that the result of Ryan's trial or sentencing would have been different.

Because Ryan has suffered no prejudice by his decision to testify at trial or at his sentencing hearing, we cannot say that trial counsel were ineffective in advising him and in permitting him to testify at either proceeding. Ryan is not entitled to postconviction relief on this issue.

## 4. FALSE TESTIMONY

In assignment of error 4, discussed by Ryan as issue 18, Ryan complains that he was denied effective assistance of counsel at sentencing because counsel failed to respond to allegedly false testimony. He further alleges in this assignment of error that his counsel was ineffective in permitting him to testify at trial. We have addressed this second issue under assignment of error 3, above.

Issue 18 concerns the testimony of Dr. Logan, the psychiatrist who testified for Ryan in support of his insanity defense. At trial, Dr. Logan testified that Ryan had told him of an "altercation" which occurred when Ryan was being inducted into military service. At Ryan's sentencing hearing, Dr. Logan again testified that Ryan apparently fought with military police and was discharged from the military 3 days later.

Following Dr. Logan's testimony at the sentencing hearing, Ryan testified that Dr. Logan had not been telling the truth about the induction incident. Ryan claimed that he was sent home for a medical reason on the third day of induction physicals. At his postconviction hearing, Ryan testified that he had not gotten into an altercation with military police at the induction center and that he had not told Dr. Logan that he was involved in such an incident.

Ryan asserts that his trial counsel was ineffective for failing to impeach Dr. Logan's testimony. He concedes that counsel's failure to respond to this issue would not have affected the outcome of the trial. However, Ryan claims that it may have affected the outcome of his sentencing, because the court used the incident to support aggravating circumstance (1)(a) in sentencing him to death.

We need not reach the issue of whether trial counsel was ineffective for failing to impeach Dr. Logan's allegedly false testimony. As we discuss in part IV(9) of this opinion in connection with assignment of error 9, Ryan has conceded that the issue of whether the evidence was sufficient to support aggravating circumstance (1)(a) was fairly presented to this court on direct appeal and that he is merely preserving the issue for federal review.

A motion for postconviction relief cannot be used to secure

review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased. *State v. Nielsen*, 243 Neb. 202, 498 N.W.2d 527 (1993); *State v. Stewart*, 242 Neb. 712, 496 N.W.2d 524 (1993), *cert. denied* ___ U.S. ___, 114 S. Ct. 97, 126 L. Ed. 2d 64. Because Dr. Logan's testimony about the induction center incident was part of the evidence used in support of aggravating circumstance (1)(a), which evidence this court found to be sufficient in Ryan's direct appeal, Ryan cannot procedurally claim at this time that he was prejudiced by his trial counsel's failure to impeach that testimony. This assignment of error is without merit.

### 5. SENTENCING ISSUES

In assignment of error 5, Ryan complains that the postconviction court erred in failing to find that he had been denied effective assistance of counsel in connection with the preparation and presentation of issues at sentencing, including the development of all statutory and nonstatutory mitigating circumstances, meeting statutory aggravating circumstances, making all available constitutional challenges to the death penalty, and formulating a reasonable trial strategy with respect to sentencing.

In addition to the four issues identified in the assignment of error itself, Ryan identifies several additional issues which he attempts to discuss simultaneously.

(a) Preparation and Presentation of Issues at Sentencing

Ryan alleges as issue 21 that trial counsel was ineffective for failing to properly prepare for sentencing, failing to obtain from the prosecution evidence which the prosecution intended to use at sentencing, and failing to discuss strategy with Ryan. This allegation is completely unsupported by the evidence, beyond Ryan's bald assertion that he had no contact with counsel in preparation for sentencing.

Goos, who was Ryan's principal attorney at the sentencing stage, testified to the contrary. Goos stated that he had kept Ryan fully apprised of what was happening in the case from the very beginning, including during preparation for the sentencing hearing. Goos specifically recalled discussing sentencing issues

with Ryan, including mitigating and aggravating circumstances.

According to Goos, his preparation for sentencing included obtaining records pertaining to attacks on the death penalty; performing a great deal of research; meeting with Ryan at the penitentiary; preparing motions and pleadings; meeting with and telephoning other attorneys, as well as possible witnesses for the sentencing hearing; and many conferences with his law clerk.

Goos' testimony is supported by documents submitted into evidence at the postconviction hearing, including letters from Goos to Ryan and Goos' time log on the case, which indicates that Goos spent over 138 hours preparing for Ryan's sentencing hearing.

Based upon this evidence, the postconviction court's finding that Ryan "[did] not point to a specific failure of counsel that would have changed the evidence considered by the court at sentencing or would make the imposition of the death penalty less likely" is not clearly erroneous.

Ryan has failed to demonstrate a reasonable probability that but for counsel's deficient performance, the outcome of his sentencing would have been different. As discussed elsewhere in this opinion, the evidence in this case is more than sufficient to support, beyond a reasonable doubt, Ryan's conviction and sentence. Therefore, we need not reach the question of whether counsel's performance was deficient. See *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Ryan is not entitled to postconviction relief on this issue.

### (b) Failure to Develop all Mitigating Circumstances

In issue 22, Ryan asserts that counsel unreasonably failed to argue the applicability of mitigating circumstances (2)(b) and (2)(f) of § 29-2523.

Mitigating circumstance (2)(b) applies when "[t]he offender acted under unusual pressures or influences or under the domination of another person." In connection with this, Ryan argues that he was strongly under the religious influence of the Reverend James Wickstrom at the time he killed Thimm. Wickstrom was a religious leader connected with the Posse

Comitatus and a group known as the Identity Movement. Prior to the time Ryan and his followers retreated to the Rulo farm, Ryan had spent a period of time attending Wickstrom's lectures, as well as listening to audiotapes and watching videotapes prepared by Wickstrom.

However, the evidence shows that Ryan's beliefs and acts went far beyond those espoused by Wickstrom. For example, Dr. Logan testified at trial that the arm test was generally accepted among Identity Movement groups to test for impurities in food based on Old Testament dietary laws, but that its use to ask routine questions of "Yahweh" about every aspect of daily existence was a deviation from Identity Movement beliefs. Dr. Logan further testified that other Identity Movement members did not believe, as did Ryan, that they possessed the spirits of archangels and had other supernatural powers.

Members of the Rulo group who testified at trial, including Ryan, consistently denied listening to the Wickstrom tapes with any frequency, even though such tapes were available. Most importantly, all members of the group perceived Ryan to be their leader, with the group members acting at his direction.

The evidence would not have supported mitigating circumstance (2)(b), and therefore, counsel's performance could not be found deficient for failing to argue its applicability.

Mitigating circumstance (2)(f) of § 29–2523 applies when "[t]he victim was a participant in the defendant's conduct or consented to the act." Ryan argues that Thimm consented to his abuse in its early phases and that Thimm had opportunities to escape but did not do so.

At the postconviction hearing, when questioned about Ryan's contention that Thimm could have left the farm but chose to stay even after his first day of torture, Goos responded, "I never saw that as a very strong argument . . . . The man was tied down." We agree with Goos.

Our review of the trial record reflects that Thimm was kept chained in the hog confinement building when he was not being tortured and that during most of the times when Thimm was being tortured, his hands or feet, or both, were bound with baling wire. In fact, the wire was still present around Thimm's hands and feet at the time his body was exhumed.

Moreover, there is evidence in the record to suggest that Thimm was in a weakened condition at the time his torture commenced. Thimm had been shot through the face by Dennis Ryan several weeks prior to his death, and there was testimony that Thimm's diet following his demotion to slave status was less than desirable, consisting of small birds that had been shot by the other men.

Based on the record in this case, it is inconceivable how Thimm could have escaped under the circumstances or how Thimm's behavior could in any rational way be interpreted as acquiescence to the torture he was forced to endure. It is abundantly clear that there was no chance that Ryan could have convinced any conscientious sentencing court of the existence of mitigating circumstance (2)(f), and counsel was not deficient for failing to argue its applicability.

Although Ryan assigns as error counsel's failure to develop nonstatutory mitigating circumstances, he does not discuss this in his brief, except to suggest that even if Wickstrom's influence of Ryan did not support mitigating circumstance (2)(b), this could have been considered as a nonstatutory mitigating circumstance. Ryan does not explain how this issue would have been any more successful as a nonstatutory mitigating circumstance than it would have been as a statutory mitigating circumstance. He merely asserts that the issue is "ripe for further development." Brief for appellant at 100. The burden is upon Ryan, as a criminal defendant seeking postconviction relief, to establish a basis for such relief. See, *State v. Williams*, 247 Neb. 931, 531 N.W.2d 222 (1995); *State v. Barrientos*, 245 Neb. 226, 512 N.W.2d 144 (1994). This he has failed to do.

Ryan is not entitled to postconviction relief on issue 22.

(c) Failure to Make All Constitutional Challenges to
Death Penalty

Ryan claims that the record supports the following direct constitutional challenges to the death penalty: (1) The jury verdict was based, at least in part, on an aiding and abetting theory; (2) the court refused to permit the jury to consider a diminished capacity defense; and (3) trial counsel failed to understand the burden of proof as to mitigating circumstances.

We turn first to Ryan's claim that his death sentence should have been challenged on constitutional grounds because the jury verdict was based in part upon an aiding and abetting theory. We have found no evidence in the record to support such a claim. The jury was instructed in the alternative, that is, that the State was required to prove that Ryan killed Thimm, "either alone or while aiding and abetting another."

The record reflects that five verdict forms were given to the jury: guilty of first degree murder, guilty of second degree murder, guilty of manslaughter, not responsible by reason of insanity, and not guilty. The jury returned the verdict form finding Ryan "guilty of first degree murder." There is no indication whether the jury based its verdict upon a finding that Ryan acted alone or upon a finding that Ryan was aiding and abetting another in the killing of Thimm.

Assuming that the jury in fact rejected an aiding and abetting theory, Ryan could not have been prejudiced by any failure of trial counsel to make a constitutional challenge to the death penalty on that basis.

Ryan also argues that he could not have aided and abetted another in the killing of Thimm because only he, of the five participants in the killing, was convicted of first degree murder. This argument is apparently premised on the erroneous notion that an aider and abettor cannot be convicted of a greater offense than a principal. Such is not the law in this state. In *State v. Secret*, 246 Neb. 1002, 1009–10, 524 N.W.2d 551, 557 (1994), we held:

> The common–law distinction between a principal and an aider and abettor has been abolished in Nebraska. *State v. Thomas*, 210 Neb. 298, 314 N.W.2d 15 (1981); *State v. Rice*, 188 Neb. 728, 199 N.W.2d 480 (1972). "A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender." Neb. Rev. Stat. § 28–206 (Reissue 1989). . . .
>
> . . . *An aider and abettor can be convicted of any crime, even a greater offense than the principal, provided the conviction is supported by the evidence of the facts and the defendant's state of mind.*

(Emphasis supplied.)

Therefore, the jury properly could have convicted Ryan of first degree murder on an aiding and abetting theory, if it did in fact choose to do so, even though none of the other participants in the killing were found guilty of first degree murder. Trial counsel could not have successfully challenged Ryan's death sentence on this basis.

Ryan also argues that under the Eighth Amendment, an aider and abettor to a killing cannot be sentenced to death unless there is a finding that the defendant killed or intended that death would result. He cites *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982), and *Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676, 95 L. Ed. 2d 127 (1987), in support of this proposition. Ryan's reliance upon *Enmund* and *Tison* is misplaced. The *Enmund* case may not be read that broadly, and such is not the holding of *Tison*.

In *Enmund*, the defendant was the driver of a getaway car who sat some 200 yards away on the roadside while two other individuals robbed and killed an elderly couple in their farmhouse. There was evidence that the couple was killed after the husband called out for help and the wife appeared with a gun and shot one of the robbers. Enmund was convicted of first degree murder and robbery and sentenced to death. His sentence was affirmed by the Florida Supreme Court, even though that court concluded that "the only evidence of the degree of [Enmund's] participation is the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes." *Enmund v. State*, 399 So. 2d 1362, 1370 (Fla. 1981).

The U.S. Supreme Court concluded that the imposition of the death penalty, in those circumstances, was inconsistent with the 8th and 14th Amendments and reversed the judgment of the Florida Supreme Court upholding Enmund's death sentence. The Court based its holding on the fact that Enmund neither killed nor intended to kill and that for the purposes of the death penalty, his culpability was limited to his participation in the robbery.

Five years later, in *Tison*, the Supreme Court again addressed the issue of whether the death penalty may be imposed upon a

defendant who has aided and abetted a killing. The facts of that case are significantly different from the facts in *Enmund*. In *Tison*, two defendant brothers and other family members planned and executed the escape of their father and another inmate from prison. After experiencing a breakdown of their vehicle, the group decided to flag down a passing motorist and steal a vehicle.

When John and Donnelda Lyons, accompanied by their 2–year–old child and 15–year–old niece, stopped to render aid, the Tison group took the Lyons vehicle at gunpoint, drove the Lyons family into the desert, and brutally shot all four family members to death with shotguns. Two of the Tison brothers were apprehended after a shootout at a police roadblock. The two brothers were convicted of capital murder, armed robbery, kidnapping, and car theft in connection with the Lyons killings, and the Arizona Supreme Court affirmed those convictions, even though the two brothers had not actually fired the shots killing the Lyons family members.

The Supreme Court, in analyzing *Tison*, revisited its analysis of *Enmund*:

> *Enmund* explicitly dealt with two distinct subsets of all felony murders in assessing whether Enmund's sentence was disproportional under the Eighth Amendment. At one pole was Enmund himself: *the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state*. Only a small minority of States even authorized the death penalty in such circumstances and even within those jurisdictions the death penalty was almost never exacted for such a crime. The Court held that capital punishment was disproportional in these cases. *Enmund* also clearly dealt with the other polar case: the felony murderer who actually killed, attempted to kill, or intended to kill. The Court clearly held that the equally small minority of jurisdictions that limited the death penalty to these circumstances could continue to exact it in accordance with local law when the circumstances warranted.

(Emphasis supplied.) 481 U.S. at 149–50.

The Court recognized that the Tison brothers' cases did not

fall into either of these neat categories. However, the Court further noted that neither do most state laws fall at the poles of the spectrum, but, rather, into two intermediate categories:

> Four States authorize the death penalty in felony–murder cases upon a showing of *culpable mental state such as recklessness or extreme indifference to human life.* Two jurisdictions require that the defendant's *participation be substantial* and the statutes of at least six more, including Arizona, *take minor participation in the felony expressly into account* in mitigation of the murder. [Nebraska is one of these six states. See § 29–2523(2)(e).] These requirements significantly overlap both in this case and in general, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.

(Emphasis supplied.) 481 U.S. at 152–53.

The Court focused upon the importance of mental state in its analysis, holding that

> the *reckless disregard for human life* implicit in knowingly engaging in criminal activities known to carry a grave risk of death *represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment* when that conduct causes its natural, though also not inevitable, lethal result.

(Emphasis supplied.) 481 U.S. at 157–58.

Ultimately, the Court held that "*major participation* in the felony committed, *combined with reckless indifference to human life*, is sufficient to satisfy the *Enmund* culpability requirement." (Emphasis supplied.) 481 U.S. at 158.

Thus, while *Enmund* held the death penalty to be unconstitutional in the case of a minor actor who had no culpable mental state with regard to killing, *Tison* allows the death penalty to be imposed on a major participant in a killing who acts with reckless indifference to the life of the victim.

Ryan was not a "minor actor" in the killing of Thimm. As noted above, it is a mitigating circumstance under Nebraska law that "[t]he offender was an accomplice in the crime committed by another person and his participation was relatively minor." § 29–2523(2)(e). In sentencing Ryan to death, the sentencing

court explicitly rejected this mitigating circumstance, stating:

> The trial record clearly identifies and shows that the defendant was the leader on the "Rulo farm" and more specifically, was the leader and instigator of the atrocities committed on James Thimm. Michael W. Ryan was the first person to probe, whip, shoot a finger, break a limb, and skin James Thimm.

Ryan's death sentence does not offend *Enmund*.

There is also ample support for Ryan's death sentence under the *Tison* standard. Regardless of whether Ryan struck the final, fatal blows to Thimm, the evidence of his involvement in the killing is overwhelming. Ryan participated fully in the abuse of Thimm. It was Ryan who consulted "Yahweh" as to the various tortures to be inflicted upon Thimm. It was Ryan who communicated "Yahweh's" desires as to Thimm's fate to the four other participants and directed them to carry out "Yahweh's" wishes. By any definition, Ryan was a major participant in the killing of Thimm.

Moreover, Ryan's actions in connection with the torture and killing of Thimm exhibited a reckless indifference to human life. By his own admission, he was aware that the torture being inflicted upon Thimm carried a grave risk of death. In fact, Ryan testified that "Yahweh" had indicated to him that Thimm should die. Ryan felt at some point that it was inevitable that Thimm would die. Even though he knew that Thimm was severely injured after his bowel had been ruptured, Ryan did not seek any type of medical attention for Thimm in order to save his life. Greater indifference to human life cannot be imagined.

As Justice Sandra Day O'Connor explained in *Tison*,

> some nonintentional murderers may be among the most dangerous and inhumane of all[, for example,] *the person who tortures another not caring whether the victim lives or dies* . . . . This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill."

(Emphasis supplied.) 481 U.S. at 157.

Ryan's death sentence meets the constitutional requirements of *Tison*. Ryan could not have prevailed on any constitutional challenge to his death sentence based upon his claim that his

verdict was based in part upon an aiding and abetting theory. Therefore, Ryan suffered no prejudice from his counsel's failure to make such a challenge.

As to Ryan's contention that counsel should have made a constitutional challenge to the death penalty based on the court's refusal to permit the jury to consider a diminished capacity defense, we held in *Ryan I* that such an instruction is not required under our law and that the trial court had not erred in refusing to give the jury Ryan's requested instruction on diminished capacity. Specifically, we stated that " 'a special diminished capacity instruction need not be given where the jury had otherwise been properly instructed that intent was an element of the crime charged.' " 233 Neb. at 105, 444 N.W.2d at 632. Therefore, Ryan has suffered no prejudice because any challenge to the death penalty on this basis would have been unavailing. This issue will not be revisited further, even though it is now framed in the language of ineffective assistance of counsel.

Ryan also claims that trial counsel was ineffective for failing to understand the burden of proof as to mitigating circumstances. Ryan states in his brief that "Goos testified [at the postconviction hearing] that . . . he may have believed at the time, that the burden of proof was on the State to disprove the existence of the mitigating factors he presented." Brief for appellant at 99. Ryan also maintains that there is "no discussion in the sentencing brief concerning which party had the ultimate burden of persuasion with respect to statutory mitigating circumstance[s]." *Id.*

The record is to the contrary. On October 16, 1986, prior to sentencing, Goos submitted a document to the sentencing court entitled "Argument and Brief in Support of Life Imprisonment." In a subsection entitled "Statutory and Nonstatutory Mitigating Circumstances," Goos wrote the following:

> There is another marked difference between the aggravating and mitigating factors, and that arises from the fact that the aggravating must be proven beyond a reasonable doubt whereas *the mitigating need only be proven by a preponderance of the evidence. And using that standard of proof, defendant believes that he is entitled to*

*(1) (b), (c) and (g) of the statutory mitigating circumstances . . . .*

(Emphasis supplied.)

Clearly, Goos was aware that it was the defendant's burden to prove the existence of the statutory mitigating circumstances, and to prove their existence by a preponderance of the evidence. To suggest otherwise borders on frivolity.

### (d) Formulating Trial Strategy With Respect to Sentencing Issues

After careful consideration, we are unable to determine any issues raised by Ryan in this subsection of assignment of error 5 which have not been addressed in detail elsewhere in this opinion.

### (e) Luke Stice Plea Bargain

As part of assignment of error 5, Ryan also discusses issue 24, in which he contends that his "trial counsel unreasonably pled the Defendant no contest to second degree murder in connection with the Luke Stice case, prior to his being sentencing [sic] in the present case, so as to establish the existence of an aggravating circumstance . . . ." Brief for appellant at 87.

The record reflects that, on July 28, 1986, while awaiting sentencing for the killing of Thimm, Ryan pled no contest to an amended information charging him with murder in the second degree in the killing of 5–year–old Luke Stice. Ryan had been scheduled for trial on a charge of first degree murder in the death of Stice, commencing on August 4.

On August 28, 1986, Ryan was given a life sentence for the killing of Stice. Ryan's sentencing hearing for the first degree murder of Thimm was held on September 15 and 16, having been continued at Ryan's request until after his trial for the killing of 5-year-old Luke Stice.

On October 16, 1986, Ryan was sentenced to death for the killing of Thimm. The sentencing court found the existence of aggravating circumstance (1)(a) of § 29-2523, that "[t]he offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal

activity," supported the death penalty.

The sentencing court cited Ryan's numerous abuses of Luke Stice, as well as other incidents of assaultive behavior by Ryan, as facts supporting beyond a reasonable doubt the existence of aggravating circumstance (1)(a). However, the court specifically stated in its sentencing order that Ryan "did not have, prior to the death of James Thimm, a prior conviction of another murder or a crime involving the use or threat of violence to the person."

Ryan has wrongly concluded that it was his plea of no contest that established the existence of aggravating circumstance (1)(a). It was Ryan's acts toward 5-year-old Stice prior to the boy's death, and not Ryan's conviction of second degree murder for his killing of Stice, which the court considered in aggravation of Ryan's sentence. Those acts were part of the trial record and could have been used in support of aggravating circumstance (1)(a) even if Ryan had not pled no contest at the time he did.

Moreover, in order to satisfy the prejudice requirement in the context of a plea, a defendant must show that there is a reasonable probability that but for counsel's errors, the defendant would not have pled and would have insisted upon going to trial. *State v. Escamilla*, 245 Neb. 13, 511 N.W.2d 58 (1994). When a defendant pleads guilty on advice of counsel, the defendant's attorney has the duty to advise the defendant of the available options and possible consequences. *Id.*

Ryan testified at this postconviction hearing that attorney Goos came to the penitentiary after Ryan's trial for Thimm's murder. Ryan stated that Goos

> started wanting to talk about the Luke Stice case, and he didn't want to try it. He wanted to come up with a plea bargain of some sort. He had too much to do. We couldn't win it, and I would have a harder time fighting two death penalty cases because he said . . . we know you're going to get the death sentence, and he said on one, he said, "If we don't have to fight the other," he said, "it will be a lot easier."

When asked what his reaction to this was, Ryan replied:

> I didn't like it. I told him, I said, "I didn't do it."
> [Goos] didn't want to fight it. He said, "Well, that's right,

he said, "Okay, I believe you." He said, "There's been too much testimony for me not to understand what happened," but, he says, "We can't win. You already seen that."

Ryan further testified that Goos did not discuss with him the effect that a plea in the Stice case might have on his sentencing in the Thimm case or that a no contest plea to second degree murder might be used to establish the existence of a statutory aggravating circumstance in the Thimm case.

Goos testified at the postconviction hearing that Ryan wanted to plead no contest to a reduced charge of second degree murder for the Stice killing. Goos stated that Ryan did not want to go to trial on that charge, even though he told Ryan that he "thought we could win that case or at least get a manslaughter," and that he in no way encouraged Ryan to plead no contest. Goos further testified that he always lets his clients decide whether they want to have a trial or to enter a plea and that Ryan wanted to enter the plea or it would not have been done. Goos testified that Ryan was told that the plea could be used as an aggravator, that he understood this, and that he wanted to enter the plea anyway.

Goos' testimony at the postconviction hearing is consistent with his notes made at the time he was representing Ryan, which were entered into evidence at the postconviction hearing. In a note dated June 24, 1986, Goos wrote the following: "CF w/Mike at Pen. Says he wants to P.N.C. – thinks he can challenge it later – I said NO!! – denies again any guilt. I said I didn't want to be a party to it; that we had a chance to win, or at least get manslaughter." On cross-examination, Goos translated the abbreviations in the memo. He testified that the first sentence meant "conference with Mike at Pen." "P.N.C." meant "plead no contest." Goos also explained that he "didn't want [Ryan] to plead no contest thinking later he could get [the conviction] removed."

Goos' notes from July 28, 1986, the day Ryan entered his plea of no contest, were also entered into evidence. In those notes, Goos wrote that " 'facts underlying this plea' may be used in aggravation." Goos testified that the judge discussed this at the time Ryan made the plea and that he thought the quoted

language was probably from what the judge had said. We note that in accepting Ryan's plea and finding him guilty of murder in the second degree, the court found such plea to be entered "voluntarily, knowingly, and intelligently, *with full understanding of the possible consequences.*" (Emphasis supplied.)

The postconviction court found that Ryan "questions the timing of the plea of no contest to the Luke Stice second degree murder, though the record shows Ryan, at the time, made that choice." The postconviction court resolved this conflict in the evidence against Ryan, and the record supports such a finding. Therefore, the postconviction court was not clearly wrong in so finding. The record also reflects that Ryan was advised that the facts underlying his plea could be used in aggravation of his sentence for the killing of Thimm.

Ryan has not shown any reasonable probability that but for the advice of Goos, he would have insisted upon going to trial. In fact, the opposite is true. Ryan appears to have insisted upon pleading no contest *in spite of* the advice of counsel. Ryan is not entitled to postconviction relief on this issue.

### (f) Failure to Object to Evidence of Aggravating Circumstances

In issue 25, Ryan alleges that his trial counsel unreasonably failed to object to evidence offered by the State to support aggravating circumstances (1)(a) and (1)(d), and failed to prepare to confront or rebut such evidence. The gist of Ryan's argument in his brief appears to be that his attorney was ineffective for failing to raise the issue of whether evidence of other crimes, admitted for a limited purpose at trial, could properly be considered by the sentencing court.

According to Neb. Rev. Stat. § 29-2522 (Reissue 1989), when a court imposes the death penalty, it is required to make its determination in writing, and such determination "shall be supported by written findings of fact *based upon the records of the trial* and the sentencing proceeding, and referring to the aggravating and mitigating circumstances involved in its determination." (Emphasis supplied.)

Neb. Rev. Stat. § 29-2521 (Reissue 1989) states that "[i]n the

proceeding for determination of sentence, evidence may be presented *as to any matter that the court deems relevant to sentence* . . . . Any such evidence which the court deems to have probative value may be received." (Emphasis supplied.)

Thus, the sentencing court, in imposing the death penalty, has not only the statutory *authority* to consider the trial record, but is statutorily *required* to make written findings of fact based upon that record.

Moreover, we have held that "the sentencing phase . . . is separate and apart from the trial phase and the traditional rules of evidence may be relaxed following conviction so that the sentencing authority can receive all information pertinent to the imposition of sentence." *State v. Anderson and Hochstein*, 207 Neb. 51, 72, 296 N.W.2d 440, 453 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981).

A sentencing court has broad discretion as to the source and type of evidence and information which may be used in determining the kind and extent of the punishment to be imposed. See, e.g., *State v. Hoffman*, 246 Neb. 265, 517 N.W.2d 618 (1994); *State v. Dean*, 237 Neb. 65, 464 N.W.2d 782 (1991); *State v. Clear*, 236 Neb. 648, 463 N.W.2d 581 (1990).

Even though the evidence of prior crimes and bad acts on the part of Ryan had been admitted for a limited purpose at the time of trial, the sentencing court was entitled, in its discretion, to consider and use such evidence in determining Ryan's sentence. That being the case, Ryan has suffered no prejudice from any failure of counsel to object to the use of such evidence in sentencing. Ryan is not entitled to postconviction relief on this issue.

### 6. CONSTITUTIONALITY OF AGGRAVATING CIRCUMSTANCES

Next, Ryan complains that the aggravating circumstances used to support his death penalty are unconstitutional both facially and as applied to him. These issues were raised as assignments of error 6 and 7, and encompass issues 1, 2, and 3.

Section 29-2523(1) enumerates eight aggravating circumstances which may be considered by the sentencing court

in determining whether to impose a death sentence upon a defendant:

(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial history of serious assaultive or terrorizing criminal activity;

(b) The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime;

(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

(d) The murder was especially heinous, atrocious, cruel, *or* manifested exceptional depravity by ordinary standards of morality and intelligence;

(e) At the time the murder was committed, the offender also committed another murder;

(f) The offender knowingly created a great risk of death to at least several persons;

(g) The victim was a law enforcement officer or a public servant having custody of the offender or another; or

(h) The crime was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws.

(Emphasis supplied.)

The trial court, in sentencing Ryan to death, found beyond a reasonable doubt that aggravating circumstances (1)(a) and (1)(d) existed in Ryan's killing of Thimm. Ryan challenges the constitutionality of both of these aggravating circumstances.

(a) Aggravating Circumstance (1)(a)

We first examine the constitutionality of aggravating circumstance (1)(a). In assignment of error 7, Ryan claims that (1)(a) is unconstitutional both facially and as applied to him. In issue 2, Ryan claims that (1)(a) is unconstitutionally vague and overbroad as applied to him because this court, on direct appeal, imputed to Ryan the serious assaultive or terrorizing acts committed by others. Ryan also claims, in issue 3, that his appellate counsel was ineffective for failing to raise on direct

appeal the issue of whether such "vicarious" acts may constitutionally be used to support (1)(a).

Ryan concedes that the constitutionality of aggravating circumstance (1)(a) was properly presented on direct appeal and that the ineffective assistance of counsel claim in issue 3 is therefore moot. However, he argues that this court's analysis of the issue was constitutionally deficient because the terms "substantial history" and "criminal activity" were not adequately narrowed or defined. We disagree.

In *State v. Holtan*, 197 Neb. 544, 250 N.W.2d 876 (1977), *cert. denied* 434 U.S. 912, 98 S. Ct. 313, 54 L. Ed. 2d 198, the defendant argued that the terms "serious assaultive or terrorizing criminal activity" were vague and indefinite. We rejected that argument, stating:

> The words "serious," "assaultive," and "terrorizing" are words in common usage with meanings well–fixed and generally clearly understood. *The term "substantial history" is likewise reasonably clear.* "History" refers to the individual's past acts preceding the incident for which he is on trial and "substantial," as here used, refers to an actual, material, and important history of acts of terror of a criminal nature.

(Emphasis supplied.) 197 Neb. at 546, 250 N.W.2d at 879.

Ryan's assertions to the contrary notwithstanding, this court long ago defined the term "substantial history." The term "criminal activity" is one in common usage, with a well–fixed and generally clearly understood meaning.

The U.S. Court of Appeals for the Eighth Circuit, in holding that aggravating circumstance (1)(a) is not unconstitutionally vague, stated that "[t]he Nebraska Supreme Court has provided sufficient guidance to sentencing bodies, concerning this particular aggravating circumstance, to prevent the arbitrary and capricious infliction of the death penalty . . . ." *Moore v. Clarke*, 904 F.2d 1226, 1234 (8th Cir. 1990), *reh'g denied* 951 F.2d 895 (8th Cir. 1991), *cert. denied* 504 U.S. 930, 112 S. Ct. 1995, 118 L. Ed. 2d 591 (1992).

Ryan's argument that the terms in aggravating circumstance (1)(a) have not been adequately narrowed and defined is lacking in legal merit, and Ryan has failed in his burden to establish a

basis for postconviction relief on this issue. We decline to further address the issue, Ryan having conceded that his ineffective assistance of counsel claim was properly presented to this court on direct appeal.

### (b) Aggravating Circumstance (1)(d)

We now turn to the constitutionality of aggravating circumstance (1)(d), challenged by Ryan as assignment of error 6 and issue 1. The State, in its brief, correctly notes that the question of the constitutionality of this aggravating circumstance was raised and disposed of in Ryan's direct appeal and argues that Ryan may not raise the issue again in a postconviction proceeding.

A death sentence is a "unique penalty" which implicates the 8th and 14th Amendments to the U.S. Constitution. *Furman v. Georgia*, 408 U.S. 238, 310, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Stewart, J., concurring). Whenever a State seeks to impose the death penalty, the discretion of the sentencing body "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

The sentencing authority's discretion must be "guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." *Profitt v. Florida*, 428 U.S. 242, 258, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976). See, also, *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980) (holding that "if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty" and must "channel" the sentencer's discretion by " 'clear and objective standards' " that provide " 'specific and detailed guidance' " and " 'make rationally reviewable the process for imposing a sentence of death' ").

The imposition of a death sentence is clearly a grave act, and the burden on this State to show that such a sentence has been constitutionally applied to a particular defendant is a heavy one.

Ryan may not be sentenced to death in reliance upon an aggravating circumstance that has not been suitably directed, limited, and defined in a constitutional fashion by this court. We therefore elect to review aggravating circumstance (1)(d) for its constitutionality both facially and as applied to Ryan.

### (i) State Law Definition of (1)(d)

Aggravating circumstance (1)(d) of § 29–2523 exists when "[t]he murder was especially heinous, atrocious, cruel, *or* manifested exceptional depravity by ordinary standards of morality and intelligence." (Emphasis supplied.) We have repeatedly stated that this aggravating circumstance

> describes two separate disjunctive circumstances which may operate together or independently of one another. [Citations omitted.] The first circumstance is that the murder was especially heinous, atrocious, or cruel. We have said this circumstance includes a " 'pitiless crime which is unnecessarily torturous to the victim' and . . . cases where torture, sadism, or the imposition of extreme suffering exists."

*State v. Reeves*, 239 Neb. 419, 431, 476 N.W.2d 829, 838 (1991), *cert. denied* 506 U.S. 837, 113 S. Ct. 114, 121 L. Ed. 2d 71 (1992). See, also, *State v. Joubert*, 224 Neb. 411, 399 N.W.2d 237 (1986), *cert. denied* 484 U.S. 905, 108 S. Ct. 247, 98 L. Ed. 2d 205 (1987); *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986), *cert. denied* 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987); *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), *cert. denied* 456 U.S. 984, 102 S. Ct. 2260, 72 L. Ed. 2d 864; *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), *cert. denied* 434 U.S. 878, 98 S. Ct. 231, 54 L. Ed. 2d 158; *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977). This first circumstance is typically referred to as the "first prong" of (1)(d).

This court has narrowed the class of especially heinous, atrocious, or cruel murders to include those involving torture, sadism, or sexual abuse. See, *State v. Palmer, supra*; *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* 469 U.S. 1028, 105 S. Ct. 447, 83 L. Ed. 2d 372; *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977), *cert. denied* 439

U.S. 882, 99 S. Ct. 220, 58 L. Ed. 2d 194 (1978); *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977), *cert. denied* 434 U.S. 912, 98 S. Ct. 313, 54 L. Ed. 2d 198. Torture may be found where the victim is subjected to serious physical, sexual, or psychological abuse before death. *State v. Palmer, supra.*

We have also held the first prong of (1)(d) to be applicable when the murder was preceded by acts performed for the satisfaction of inflicting either mental or physical pain or when such pain exists for any prolonged period of time. See, *State v. Victor*, 235 Neb. 770, 457 N.W.2d 431 (1990), *cert. denied* 498 U.S. 1127, 111 S. Ct. 1091, 112 L. Ed. 2d 1195 (1991); *State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708 (1985). In other words, this prong must be looked upon through the eyes of the victim. *State v. Joubert, supra.*

The second circumstance, or prong, is that the murder manifested exceptional depravity.

"[E]xceptional depravity" in a murder exists when it is shown, beyond a reasonable doubt, that the following circumstances, either separately or collectively, exist in reference to a first degree murder: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; or (5) helplessness of the victim. . . . [W]here one or more of those five factors are present, there may be a finding of "exceptional depravity" concerning a first degree murder.

*State v. Palmer*, 224 Neb. at 320, 399 N.W.2d at 731–32.

The second prong of (1)(d), that the murder manifested exceptional depravity by ordinary standards of morality and intelligence, pertains to the state of mind of the actor. *State v. Otey*, 236 Neb. 915, 464 N.W.2d 352 (1991), *cert. denied* 501 U.S. 1201, 111 S. Ct. 2279, 115 L. Ed. 2d 965; *State v. Moore, supra.* We have held that this prong refers to a murder so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life. *State v. Moore, supra*; *State v. Peery, supra*; *State v. Rust, supra.*

*(ii) Federal Law Analysis of (1)(d)*

The U.S. Supreme Court has held the words "heinous,"

"atrocious," and "cruel" to be unconstitutionally vague in an
Oklahoma sentencing statute which is very comparable to
Nebraska's § 29–2523(1)(d). See *Maynard v. Cartwright*, 486
U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988). See,
also, *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S. Ct. 1759,
64 L. Ed. 2d 398 (1980) (holding Georgia's " 'outrageously or
wantonly vile, horrible or inhuman' " aggravating circumstance
to be unconstitutional because the Georgia court failed to limit
the statute in such a way as to provide a principled distinction
between death penalty and non–death–penalty cases).

In both *Maynard* and *Godfrey*, the defendant was sentenced
to death by a jury which had been instructed in only the bare
language of the sentencing statute or in language which was
similarly vague.

Likewise, the U.S. Court of Appeals for the Eighth Circuit
has found the text of Nebraska's aggravating circumstance
(1)(d), standing alone, to be constitutionally insufficient. *Moore
v. Clarke*, 904 F.2d 1226 (8th Cir. 1990), *reh'g denied* 951 F.2d
895 (8th Cir. 1991), *cert. denied* 504 U.S. 930, 112 S. Ct.
1995, 118 L. Ed. 2d 591 (1992). However, "a state supreme
court may salvage a facially–vague statute by construing it to
provide the sentencing body with objective criteria for applying
the statute." *Moore v. Clark*, 904 F.2d at 1229. The Eighth
Circuit, in several recent cases, has looked beyond the text of
§ 29–2523(1)(d) to determine whether (1)(d) has been limited
and defined by this court in such a way as to provide sentencing
bodies in Nebraska with objective criteria for the application of
that aggravating circumstance.

The Eighth Circuit has held that the first prong of aggravating
circumstance (1)(d) of § 29–2523, narrowed by this court's
decisions defining the phrase "especially heinous, atrocious,
cruel" to mean unnecessarily torturous to the victim, satisfies
the constitutional requirements of *Gregg v. Georgia*, 428 U.S.
153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Godfrey v.
Georgia, supra*; and *Maynard v. Cartwright, supra*. See *Harper
v. Grammer*, 895 F.2d 473 (8th Cir. 1990).

However, even as limited and defined by this court, the
"exceptional depravity" language of the second prong of
aggravating circumstance (1)(d), has failed to pass constitutional

muster in the federal courts. In *Moore v. Clarke, supra*, the Eighth Circuit found that a sentencing body could "glean only subjective and unilluminating fragments from existing [Nebraska] case law." 904 F.2d at 1232. That court held that the language of the second prong, even as defined and limited by case law, remained unconstitutionally vague and provided "insufficient guidance to a sentencing body called upon to determine whether a particular murder 'manifested exceptional depravity.' " 904 F.2d at 1233. See, also, *Holtan v. Black*, No. CV 84-L-393, 1986 WL 12479 (D. Neb. Nov. 5, 1986), *vacated on other grounds* 838 F.2d 984 (8th Cir. 1988).

Importantly, though, the Eighth Circuit held in *Harper* that *the invalidity of the second prong of (1)(d) does not vitiate the efficacy of the first prong.* Harper's sentencing court had relied upon facts supporting both the first and second prongs of aggravating circumstance (1)(d). Because aggravating circumstance (1)(d) was constitutional at least in part and had been validly established by the first prong, the court held that it was unnecessary to resentence Harper.

In *Williams v. Clarke*, 40 F.3d 1529 (8th Cir. 1994), the Eighth Circuit again upheld a defendant's death sentence even though the sentencing panel had relied partially upon the unconstitutional second prong of (1)(d). The court found that the defendant's sexual assault of his murder victim was sufficient to support the constitutional first prong. Quoting *Harper*, the court noted that " ' "[t]he two prongs are not separate factors*; each of the prongs simply purports to be justification for the application of the aggravating factor." ' " (Emphasis supplied.) 40 F.3d at 1535.

We therefore hold that aggravating circumstance (1)(d) is facially constitutional to the extent that the first prong has been narrowed and defined by this court. We now determine whether aggravating circumstance (1)(d) has been constitutionally applied to Ryan.

### (iii) Application of (1)(d) to Ryan

Ryan does not dispute the constitutionality of the first prong of aggravating circumstance (1)(d), nor does he assert that the sentencing judge relied solely upon the unconstitutional second

prong of (1)(d). Rather, he complains that the sentencing judge made only a single series of findings of fact supporting the application of (1)(d), instead of stating which findings of fact supported which prong. He asserts that the record "makes it clear that the trial court and the appellate court relied heavily on the 'exceptional depravity' component of (1)(d)" in sentencing him to death. Brief for appellant at 22.

Ryan contends that it is "pure speculation to conclude that the original sentencing judge would have reached the same conclusion about the weight given to circumstance (1)(d), if only the first prong applied." Brief for appellant at 25.

In finding that aggravating circumstance (1)(d) applied to Ryan's killing of Thimm, the sentencing court stated in part:

Some of the facts supported by the evidence which would allow this Court to find beyond a reasonable doubt that the murder of James Thimm was especially heinous, atrocious, cruel, *or* manifested exceptional depravity by ordinary standards of morality and intelligence are as follows:

a) The death of James Thimm occurred over several days while James Thimm was tied and chained in a hog confinement shed;

b) Michael W. Ryan on numerous occasions sodomized James Thimm with a shovel handle and directed others to do the same;

c) Michael W. Ryan upon several occasions whipped and beat James Thimm and directed others to do the same;

d) Michael W. Ryan shot the fingertips of James Thimm with a .22 caliber pistol and directed others to do the same;

e) Michael W. Ryan skinned James Thimm while he was alive;

f) Michael W. Ryan broke James Thimm's arm and directed others to assist in that effort;

g) Michael W. Ryan broke James Thimm's legs and directed others to assist with this;

h) Michael W. Ryan, by force, crushed James Thimm's ribcage[,] which was the final act that caused his death;

i) There is also some evidence that Michael W. Ryan

either removed or amputated James Thimm's penis and testicles or directed that this be done by others;

j) Michael W. Ryan wired or chained James Thimm to a farrowing crate while all of these cruel acts were taking place or directed that others do this to James Thimm;

k) Michael W. Ryan caused James Thimm to suffer further humiliation by directing him to perform homosexual acts with another member of the group.

THE COURT CONCLUDES AND FINDS BEYOND A REASONABLE DOUBT THIS AGGRAVATING CIRCUMSTANCE EXISTS IN THIS CASE.

(Emphasis supplied.)

While it is true that the sentencing judge, in his order, did not apply the facts to each prong of (1)(d) separately, the language of the order indicates that the sentencing judge found facts to support the application of *either* the first or second prong of (1)(d) beyond a reasonable doubt. This is not fatal to the use of (1)(d) as an aggravating circumstance.

It is evident that to the extent that the sentencing court may have based its factual findings upon the unconstitutional second prong of (1)(d), Ryan's death sentence may be tainted by constitutional error, although not necessarily reversible error. See *Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988) (holding that "not all constitutional violations amount to reversible error"). Accord *Williams v. Clarke*, 40 F.3d 1529 (8th Cir. 1994). "[T]here may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Moreover, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24.

In *Clemons v. Mississippi*, 494 U.S. 738, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990), the U.S. Supreme Court held that upon a determination that an invalid aggravating circumstance had been considered by a sentencing body, it was constitutionally permissible for a state supreme court to either

reweigh the aggravating and mitigating circumstances or to perform a harmless error analysis.

However, the U.S. Court of Appeals for the Eighth Circuit has held that appellate reweighing violates a defendant's right to due process under Nebraska's death penalty sentencing statutes. See *Rust v. Hopkins*, 984 F.2d 1486 (8th Cir. 1993), *cert. denied* 508 U.S. 967, 113 S. Ct. 2950, 124 L. Ed. 2d 697. See, also, *Reeves v. Hopkins*, No. CV90–L–311, 1994 WL 704553 (D. Neb. Dec. 16, 1994). That leaves this court with the options of performing a harmless error analysis or remanding the cause to the district court for a new sentencing hearing. See *State v. Reeves*, 239 Neb. 419, 476 N.W.2d 829 (1991), *cert. denied* 506 U.S. 837, 113 S. Ct. 114, 121 L. Ed. 2d 71 (1992). We elect to perform a harmless error analysis.

### (iv) Harmless Error Analysis

Harmless error analysis of constitutional error is governed by *Chapman v. California, supra.* The Eighth Circuit, applying the *Chapman* analysis in *Williams v. Clarke, supra,* stated:

> [T]he issue under *Chapman* is whether the sentencer actually rested its decision to impose the death penalty on the valid evidence and the constitutional aggravating factors, independently of the vague factor considered; in other words, whether what was actually and properly considered in the decision–making process was "so overwhelming" that the decision would have been the same even absent the invalid factor.

40 F.3d at 1541.

While it may be said that many of the sentencing court's findings might implicate the second prong of aggravating circumstance (1)(d), those same facts help to overwhelmingly support the constitutional first prong of (1)(d). Upon a review of the facts of this case, it is clear beyond a reasonable doubt that the sentencing court's decision would have been the same absent any reliance upon the "exceptional depravity" language of the second prong of (1)(d).

The facts listed by the sentencing court in support of aggravating circumstance (1)(d) are most horrid examples of both torture and sexual abuse. It is not necessary to consider

each of these facts; we need look no further than those admitted by Ryan himself and confirmed by the testimony of his partners in this ghastly crime.

Ryan admitted that he sodomized Thimm with a shovel handle. He further admitted directing Dennis Ryan, Andreas, and the two Haverkamps to sodomize Thimm also, in a sequence dictated by "Yahweh." All four of these men testified at trial and confirmed Ryan's account of how Thimm was sodomized. All five participants testified that at some point, Thimm's rectum was ruptured. Pathologists for both the State and for Ryan testified that there was also a traumatic injury to Thimm's liver, indicating that a blunt foreign object had been thrust some $1^1/2$ to 2 feet into Thimm's body cavity.

This incomprehensibly gruesome activity overwhelmingly supports a finding beyond a reasonable doubt that Thimm's murder involved sexual abuse. This fact further overwhelmingly supports a finding beyond a reasonable doubt that Ryan tortured Thimm, torture being defined by this court as " 'serious physical, sexual, or psychological abuse before death.' " *State v. Palmer*, 224 Neb. 282, 315, 399 N.W.2d 706, 729 (1986), *cert. denied* 484 U.S. 872, 108 S. Ct. 206, 98 L. Ed. 2d 157 (1987).

Ryan also admitted that he whipped Thimm on at least three occasions and directed the other four men to whip Thimm on these same three occasions, because "Yahweh" indicated to Ryan that Thimm had not been punished enough for his supposed transgressions. Dennis Ryan, Andreas, and the two Haverkamps also testified that Thimm was repeatedly whipped by Michael Ryan and by themselves upon Ryan's instructions. The pathologist for the State testified at trial that during his autopsy of Thimm's body he discovered linear bruises all over Thimm's back, as well as hemorrhaging into the soft tissues under the skin on Thimm's back. The fact that Ryan, by his own admission, repeatedly whipped Thimm also overwhelmingly supports, beyond a reasonable doubt, the conclusion that Thimm was brutally tortured prior to his death.

Ryan admitted that he shot off one of the fingertips of Thimm's left hand with a .22-caliber pistol and directed the four other men that "Yahweh" would permit each of them to

shoot off one of Thimm's fingertips. Moreover, Ryan admits that Thimm was held captive in a hog confinement shed for a period of at least 2 days while these acts were taking place and that Thimm was chained or bound with baling wire much of the time, either by Ryan or at his direction. Again, these facts are sufficient to support beyond a reasonable doubt that Ryan tortured Thimm prior to his death. It is uncontroverted in the record that Thimm was alive and conscious during all of the above episodes of sexual abuse and torture.

Ryan admitted that he broke Thimm's arm, but testified that he was not positive whether Thimm was alive or dead at that time. Timothy Haverkamp, who was present at the time Ryan broke Thimm's arm, testified that Thimm was alive at the time. Although he was not present at the time Ryan actually broke Thimm's arm, James Haverkamp testified that he observed Thimm breathing after his arm was broken.

Ryan admitted that he skinned part of Thimm's lower right leg with a razor blade and a pair of pliers, but contends that Thimm was dead at that time. However, Timothy Haverkamp testified that Thimm was alive at the time Ryan skinned Thimm's leg, that Ryan told Thimm that he was going to skin him and then held up a piece of the skin to show to Thimm, and that Thimm was moving his eyes and could still talk "partway." James Haverkamp testified that he observed Thimm after his leg was skinned and that he was breathing at that time.

The evidence, beyond a reasonable doubt, shows that Thimm was still alive and conscious when his leg was skinned. Moreover, all the evidence indicates that Ryan skinned Thimm's leg after breaking Thimm's arm. It thus can be inferred that Thimm was still alive when his arm was broken. Breaking the bones of, and skinning, a living human being are facts that overwhelmingly constitute torture beyond a reasonable doubt.

The above evidence provides overwhelming factual support for the sentencing court's finding that Ryan's murder of Thimm was "especially heinous, atrocious, [and] cruel." There can be no more horrible way to die than to be chained in an animal shed for several days; to be repeatedly sodomized, whipped, shot, and skinned; to have one's bones broken; and to have all of this done in the name of one's god. If these acts are not

especially heinous, atrocious, and cruel, no acts are. If these facts do not support the existence of aggravating circumstance (1)(d), no facts ever will.

Any one of these acts is an objective factor sufficient to satisfy beyond a reasonable doubt the existence of aggravating circumstance (1)(d) as the first prong had been defined and limited by this court at the time Ryan was sentenced to death. See, e.g., *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984), *cert. denied* 469 U.S. 1028, 105 S. Ct. 447, 83 L. Ed. 2d 372; *State v. Moore*, 210 Neb. 457, 316 N.W.2d 33 (1982), *cert. denied* 456 U.S. 984, 102 S. Ct. 2260, 72 L. Ed. 2d 864; *State v. Peery*, 199 Neb. 656, 261 N.W.2d 95 (1977), *cert. denied* 439 U.S. 882, 99 S. Ct. 220, 58 L. Ed. 2d 194 (1978); *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881 (1977), *cert. denied* 434 U.S. 878, 98 S. Ct. 231, 54 L. Ed. 2d 158; *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867 (1977), *cert. denied* 434 U.S. 912, 98 S. Ct. 313, 54 L. Ed. 2d 198; *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977). See, also, *Williams v. Clarke*, 40 F.3d 1529 (8th Cir. 1994) (holding a finding of sexual abuse to be an objective factor which constitutionally and appropriately narrows the definition of the first prong of (1)(d)); *Harper v. Grammer*, 895 F.2d 473 (8th Cir. 1990) (holding that the first prong of (1)(d) was constitutionally applied to defendant in case where facts indicated that the murder was unnecessarily torturous to the victims).

Ryan's argument that the sentencing court's order is heavily based on a finding of "exceptional depravity" is wholly without merit. The facts of this case clearly establish that Ryan's murder of Thimm was aggravated by repeated acts of torture and sexual abuse. Therefore, even absent any consideration of the second prong, aggravating circumstance (1)(d) is nonetheless amply established beyond a reasonable doubt by facts in support of the constitutional first prong which are so overwhelming that any consideration of the second prong could only constitute harmless error.

We find, beyond a reasonable doubt, that Ryan would have been sentenced to death whether or not the sentencing court considered the second prong of aggravating circumstance (1)(d). This assignment of error is without merit.

### 7. SENTENCING PANEL AND RECUSAL OF JUDGE

In his eighth assignment of error, Ryan contends that appellate counsel unreasonably failed to raise on direct appeal that his constitutional rights in regard to sentencing were violated by (1) a lack of standards for when a three–judge panel is used for sentencing, (2) the trial judge's refusal to recuse himself, and (3) the trial judge's refusal to convene a three–judge panel.

We turn first to the two issues raised regarding the use of a three–judge panel for sentencing, discussed by Ryan as issues 5 and 20. These two issues were fully addressed by this court in Ryan's direct appeal. See *Ryan I.* In that case, we rejected Ryan's argument that a three–judge panel should be mandatory when requested by a defendant, because Neb. Rev. Stat. § 29-2520 (Reissue 1989) specifically grants to the trial judge the discretion to request a panel for purposes of sentencing a defendant convicted of first degree murder. We further held that § 29-2520 violates neither the Nebraska Constitution nor the U.S. Constitution. Moreover, we found that there was no evidence in the record indicating that Ryan had suffered any prejudice by the trial judge's refusal to request a three–judge panel for sentencing.

A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal. *State v. Jones*, 246 Neb. 673, 522 N.W.2d 414 (1994); *State v. Lindsay*, 246 Neb. 101, 517 N.W.2d 102 (1994); *State v. Bowen*, 244 Neb. 204, 505 N.W.2d 682 (1993).

Because issues 5 and 20 have already been litigated on direct appeal, Ryan is not entitled to further review of these issues.

Ryan has conceded in his brief that his claim that his constitutional rights were violated at sentencing because the trial judge refused to recuse himself, discussed as issue 7, was fairly presented by counsel on direct appeal. Because all three issues raised by Ryan in assignment of error 8 have been litigated and decided adversely to Ryan on direct appeal, this assignment of error affords Ryan no basis for postconviction relief.

### 8. SUFFICIENCY OF EVIDENCE FOR AGGRAVATING CIRCUMSTANCES

In his ninth assignment of error, Ryan claims that his counsel

was ineffective in failing to raise on direct appeal whether there was sufficient evidence of aggravating circumstances (1)(a) and (1)(d) in support of his death sentence. This was brought before the postconviction court as issues 8 and 9.

Ryan now concedes that these issues were fairly presented to this court on direct appeal and that each claim "lacks factual merit." Brief for appellant at 36. Ryan indicates that he is merely preserving the issues for federal review. Because Ryan concedes that assignment of error 9 has no merit, and because we generally do not review issues which have been previously litigated on direct appeal, we decline to further consider this assignment of error.

### 9. PROPORTIONALITY REVIEW

Ryan complains, in assignment of error 10 and issue 4, that the district court erred in failing to find that he was denied his right to a statutory proportionality review on direct appeal. This is not the precise issue that was before the postconviction court. Rather, the record shows that the issue presented was "[w]hether trial [sic] counsel unreasonably failed to argue on direct appeal that the Nebraska Supreme Court's declaration that the statutorily mandated 'proportionality' review of sentences imposed in 'criminal homicide' cases is unconstitutional," thus rendering the remaining provisions of the death penalty unenforceable.

Following Ryan's postconviction hearing, counsel for Ryan stated to the court that appellate counsel had, indeed, raised the issue of proportionality review in constitutional terms. Ryan concedes in his brief that the issue had been raised and fairly presented on direct appeal and that the only purpose for raising the issue at this time was to preserve it for federal review.

Because Ryan concedes that this issue was raised on direct appeal, at which time it was fully litigated, Ryan cannot secure further review of the issue by way of a motion for postconviction relief. See, *State v. Jones, supra*; *State v. Lindsay, supra*; *State v. Bowen, supra*. This assignment of error is without merit.

### 10. DEPOSITION MISCONDUCT

Once more, Ryan's assignment of error differs from the issue

which he raised in his postconviction hearing. In assignment of error 11, Ryan states that the trial court erred in failing to find that deposition misconduct by the prosecution deprived him of his right to due process of law. However, at the postconviction hearing and in his brief before this court, this issue was addressed as issue 15, and defined as

> [w]hether trial counsel unreasonably failed to make an adequate record of the fact that during defense discovery depositions of Ora Richard Stice and John David Andreas, the Sheriff played a tape recording of Stice's testimony for the benefit of Andreas before Andreas gave his deposition, in order to "align" their testimony; and/or unreasonably failed to object to such conduct and bring the issue to the attention of the trial court, either to disqualify the witnesses, or to seek dismissal of the charges for reasons of prosecutorial misconduct, or for the purposes of producing evidence to "impeach" the testimony of such witnesses at trial, in violation of the Defendant's rights under the Sixth Amendment of the United States Constitution, and Art. I sec. 11 of the Nebraska Constitution.

Specifically, Ryan complains that the State tape-recorded the deposition of Stice and played the tape for Andreas before Andreas gave his deposition so that Andreas could give testimony consistent with what had been testified to by Stice. Ryan further claims that Andreas' deposition was taped and played for James Haverkamp prior to Haverkamp's deposition.

The record shows that Ryan's counsel filed a motion to preclude the testimony of Haverkamp and Andreas based on the alleged deposition misconduct. Dennis Ryan's counsel joined in the motion and requested an evidentiary hearing on the issue. Michael Ryan's counsel stated that he was *not* requesting an evidentiary hearing on that motion, although he was seeking an evidentiary hearing on a related motion regarding the sentencing of Andreas and Haverkamp. The trial court denied the request for an evidentiary hearing on the motion to preclude the testimony of Haverkamp and Andreas and deferred ruling until Dennis Ryan's counsel filed appropriate affidavits in support of the motion.

There is no evidence in the record before us that any supporting affidavits were ever filed by either counsel or that the court ever made a final ruling on the motion. Both Haverkamp and Andreas testified at trial. Neither Michael Ryan's nor Dennis Ryan's defense attorneys objected or filed a motion to preclude the testimony of either Haverkamp or Andreas during trial.

We note that Michael Ryan was represented by different counsel on direct appeal than he was at the guilt phase of his trial. Therefore, there was no reason Ryan could not have raised, on direct appeal, the issue of whether trial counsel were ineffective in their actions related to the alleged deposition misconduct. A motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal. *State v. Keithley*, 247 Neb. 638, 529 N.W.2d 541 (1995); *State v. Jones*, 246 Neb. 673, 522 N.W.2d 414 (1994); *State v. Lindsay*, 246 Neb. 101, 517 N.W.2d 102 (1994); *State v. Bowen*, 244 Neb. 204, 505 N.W.2d 682 (1993). This assignment of error is without merit.

## 11. Firing Trial Attorney

In assignment of error 12, discussed as issue 19, Ryan contends that the postconviction court erred in failing to find that Ryan was deprived of his right to counsel when the trial court fired one of his defense attorneys. The trial court terminated the services of court-appointed defense attorney Ligouri after Ryan's trial, but before his sentencing hearing.

Ryan raised an identical ineffective assistance of counsel claim on his direct appeal. See *Ryan I*. We held then that Ryan had received effective representation and that he had failed to show any prejudice by the firing of Ligouri.

This issue, having been fully litigated and decided adversely to Ryan on direct appeal, affords Ryan no basis for postconviction relief. See, *State v. Jones, supra*; *State v. Lindsay, supra*; *State v. Bowen, supra*.

## 12. Judicial Misconduct

In issue 30, Ryan claims that trial counsel unreasonably failed to object to judicial misconduct at trial. In issue 31, Ryan

claims that trial counsel unreasonably failed to raise judicial misconduct as grounds for recusal of the trial judge from the sentencing process and as grounds for impaneling a three-judge panel for sentencing. Ryan has discussed these two issues together in his brief, and we will likewise consider them together for purposes of our analysis.

Ryan asserts, in issue 30, that the trial judge "exhibited contempt for Ryan by turning his back on Ryan during Ryan's testimony before the jury." Brief for appellant at 107. Ryan argues that the performance of both trial counsel and appellate counsel was deficient as to this issue.

Issue 31 relates to an ex parte communication which the sentencing judge had with the Stice family after Ryan had pled no contest to second degree murder in the killing of 5-year-old Luke Stice. The communication took place after Ryan's conviction for the murder of Thimm, but before his sentencing hearing on that conviction, and before his sentencing for the killing of Stice. Again, Ryan asserts that both trial counsel and appellate counsel were ineffective.

As Ryan concedes in his brief, these issues relating to judicial misconduct were raised and disposed of on direct appeal. This court considered whether the trial judge's conduct had prejudiced Ryan's right to a fair trial and concluded that it had not. As to the judge's actions in turning his back during Ryan's trial testimony, we stated:

> The fact that the trial judge turned away from the defendant in an attempt to hide his expressions from the jury while the defendant described, in detail, the atrocities of his crime was inappropriate, *but does not constitute prejudicial error in this case.* There are cases when such conduct by a judge might constitute prejudicial error in a criminal trial, but *in this case, where the evidence of defendant's guilt is so overwhelming, we hold that the trial judge's actions did not constitute reversible error.* It would have been better had the judge observed all witnesses while they testified about the sickening events, as the jury was required to do, but *the judge's conduct does not constitute prejudicial error in this case.*

(Emphasis supplied.) *Ryan I*, 233 Neb. at 122, 444 N.W.2d at 641.

Likewise, we held that any ex parte communication by the judge with the Stice family could not have been prejudicial to Ryan. "[A]ny communications with the Stice family occurred *after the case had been submitted to the jury and the jury had determined defendant guilty* of first degree murder. The activities in this regard could not have affected the jury verdict in any way." (Emphasis supplied.) *Id.*

Moreover, as noted in *Ryan I,* and as we now again note, Ryan's conviction for the second degree murder of 5–year–old Luke Stice *was not used by the sentencing court* as an aggravating factor. Therefore, the judge's ex parte communication with the Stice family could not have prejudiced Ryan at either the trial phase or the sentencing phase of the proceedings.

Although we do not condone the cited actions of the trial judge, our holding in *Ryan I* that Ryan was not prejudiced by the judge's actions is dispositive of Ryan's claim that trial counsel and appellate counsel were ineffective in failing to raise the issue of judicial misconduct. In the absence of a showing of prejudice, Ryan is not entitled to postconviction relief on either issue 30 or issue 31. These issues were decided on direct appeal, and Ryan is not entitled to have them relitigated in a postconviction proceeding.

### 13. CUMULATIVE ERROR

In assignment of error 13, also discussed as issue 37, Ryan contends that cumulative error at trial and sentencing deprived him of his due process right to a fair trial. Ryan raised this issue on direct appeal, at which time we held that

the combined effect of the errors defendant alleged occurred at trial was *harmless beyond a reasonable doubt and that the defendant was not prejudiced* by these alleged errors. This conclusion is supported by the overwhelming evidence against the defendant, including the defendant's own testimony as to his part in the murder of James Thimm. The cumulative effect of these alleged errors did not have a material effect on the jury in reaching its verdict. A defendant is not constitutionally entitled to receive a perfect trial, only a fair and constitutional trial.

(Emphasis supplied.) *Ryan I*, 233 Neb. at 150, 444 N.W.2d at 656.

Because we generally do not review issues which have been previously litigated on direct appeal, we decline to further consider this assignment of error.

### 14. OTHER ISSUES CONCEDED BY RYAN

Ryan also has raised other issues which he now concedes are not factually supported by the evidence or were disposed of on direct appeal and which he declines to discuss in his brief. These issues include the failure of counsel to call certain witnesses (issue 16), failure of counsel to cross-examine one of the female group members (issue 17), misconduct by the prosecutor and a State Patrol investigator (issue 26), judicial interference with the right to counsel (issue 32), failure of counsel to object to a jury instruction (issue 33), violation of a sequestration order by the State's expert witnesses (issue 34), and juror misconduct by falling asleep at trial and by reading a newspaper (issues 35 and 36).

We have examined the above issues for plain error, and finding none, we will not address them further.

### 15. FAILURE TO GRANT POSTCONVICTION RELIEF

In assignment of error 14, Ryan alleges that the postconviction court erred in failing to grant him postconviction relief. After carefully considering all of Ryan's previous assignments of error and issues presented for consideration by the court and finding all of these to be without merit, we hold that the district court correctly denied Ryan's petition for postconviction relief.

## V. CONCLUSION

There being no merit to any of Ryan's assignments of error or to any of the issues raised by him, the judgment of the district court denying postconviction relief to Ryan is affirmed.

AFFIRMED.